# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**SOUTHWEST SERVICES, L.L.C. A/K/A SOUTH WEST SERVICES, LLC, and TIMOTHY A. SACK,**<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |

Plaintiff Commodity Futures Trading Commission ("Commission") alleges as follows:

## I.  SUMMARY

1. Beginning from at least August 2016 through at least April 2018 (the "Relevant Period"), Southwest Services, L.L.C. a/k/a South West Services, LLC ("Southwest Services"), a Wisconsin limited liability company, offered to enter into and/or entered into agreements, contracts, or transactions in financed retail foreign currency ("forex") with customers located in the United States who were not eligible contract participants ("ECPs") that did not result in the delivery of forex within two (2) days of the transaction date. Southwest Services did so without being registered with the Commission as a retail foreign exchange dealer ("RFED"), in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2018), and Commission Regulation ("Regulation") 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2019).

2. Throughout the Relevant Period, Timothy A. Sack ("Sack"), who organized and operated Southwest Services as its sole managing member, associated himself with an unregistered RFED as a partner, officer, sole managing member, or employee (or occupying a similar status or performing similar functions), in a capacity that involved: (i) the solicitation or acceptance of retail forex customers' orders; or (ii) the supervision of any person so engaged. By associating himself with Southwest Services in such a capacity throughout the Relevant Period, Sack acted as an associated person ("AP") of an RFED without being registered with the Commission, in violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2018), and Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2019).

3. Throughout the Relevant Period, each time Southwest Services solicited an actual or prospective customer and/or opened an account for a retail forex customer to engage in retail forex transactions, it failed to provide each retail forex customer with a written "risk disclosure statement," in violation of Regulation 5.5(a)(1)(i), 17 C.F.R. § 5.5(a)(1)(i) (2019).

4. Throughout the Relevant Period, Southwest Services acted as an RFED and failed to maintain records required to be kept by RFEDs, in violation of Regulation 5.13(d), 17 C.F.R. § 5.13(d) (2019).

5. As the sole managing member of a limited liability company, Sack controlled Southwest Services throughout the Relevant Period and failed to act in good faith or knowingly induced Southwest Services' violations alleged herein. Sack is therefore liable for Southwest Services' violations as a controlling person pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2018).

6. At all relevant times, the acts and omissions of Sack, and any other employees and/or agents of Southwest Services, were committed within the scope of their employment,

agency, or office with Southwest Services; therefore, Southwest Services is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019), as a principal for the actions and omissions of Sack, and any other employees or agents of Southwest Services, in violation of the CEA.

7. By this conduct, and the conduct further alleged herein, Southwest Services and Sack (collectively, "Defendants") have engaged in acts and practices that violated certain registration and recordkeeping provisions of the CEA and Regulations, including 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), 17 C.F.R. § 5.3(a)(6)(i), and 17 C.F.R. § 5.3(a)(6)(ii), 17 C.F.R. § 5.5, and 17 C.F.R. § 5.13(d).

8. Accordingly, pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1 (2018), and 7 U.S.C. § 2(c)(2)(C), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA and Regulations, and to further enjoin them from engaging in certain commodity or forex-related activity, including soliciting or accepting orders from non-ECP U.S. customers and offering to be the counterparty to customers' forex transactions without appropriate registration with the Commission, failing to keep required records, and opening accounts without the required disclosure statements.

9. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief including, but not limited to, restitution, disgorgement, trading and registration bans, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by

3

any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2018), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief or to enforce compliance with the CEA whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in, an act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

11. Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants resided and/or transacted business in the Eastern District of Wisconsin, and certain transactions, acts, and practices alleged in this Complaint occurred within this District.

### III.    THE PARTIES

12. Plaintiff **Commodity Futures Trading Commission** ("Commission") is an independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA, 7 U.S.C. §§ 1–26 (2018), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1–190 (2019).

13. Defendant **Southwest Services, L.L.C.,** a/k/a South West Services, LLC ("Southwest Services"), is a Wisconsin limited liability company, formed in August 2016. Southwest Services maintained its principal office in Oshkosh, Wisconsin during the Relevant Period. Southwest Services has never been registered with the Commission in any capacity.

14. Defendant **Timothy A. Sack** ("Sack") is the sole managing member of Southwest Services, and was responsible for creating and operating Southwest Services as a Wisconsin limited liability company during the Relevant Period. He is a resident of Oshkosh, Wisconsin. Sack has never been registered with the Commission in any capacity.

## IV. STATUTORY BACKGROUND

15. Section 2(c)(2)(C)(i)(I) of the CEA, 7 U.S.C. § 2(c)(2)(C)(i)(I) (2018), in relevant part, applies to any agreement, contract, or transaction in forex that is offered to, or entered into with, a person that is not an ECP, subject to certain exceptions not applicable herein. The agreement, contract, or transaction in forex must be offered or entered into on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis. *Id.* Section 2(c)(2)(C)(i)(II)(bb) of the CEA, 7 U.S.C. § 2(c)(2)(C)(i)(I)(bb) (2018), in relevant part, provides that Section 2(c)(2)(C)(i)(I) shall not apply to a contract of sale that results in actual delivery within two (2) days of the transaction, or that creates an enforceable obligation to deliver between a seller and buyer that have the ability to deliver and accept delivery, respectively, in connection with their line of business.

16. The CEA defines an ECP, in relevant part, as an individual: (a) who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million; or (b) $5 million if the individual enters into the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." Section §1a(18)(xi) of the CEA, 7 U.S.C. § 1a(18) (xi) (2018).

17. Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2019), in relevant part, defines an RFED as "any person that is, or offers to be, the counterparty to a retail forex transaction," subject to certain exceptions not applicable here. Pursuant to Section 1a(38) of the CEA, 7 U.S.C. § 1a(38) (2018), "the term 'person' imports the plural or singular, and includes individuals, associates, partnerships, corporations, and trusts."

18. Regulation 5.1(m), 17 C.F.R. § 5.1(m) (2019), in relevant part, defines a retail forex transaction as any account, agreement, contract, or transaction described in 7 U.S.C.

5

§ 2(c)(2)(C). "A retail forex transaction does not include an account, agreement, contract, or transaction in forex that is a contract of sale of a commodity for future delivery (or an option thereon) that is executed, traded on or otherwise subject to the rules of a contract market designated pursuant to Section 5(a) of the CEA, 7 U.S.C. § 5(a) (2018)." *Id*.

19. Regulation 5.1(h)(2), 17 C.F.R. § 5.1(h)(2) (2019), in relevant part, defines an AP of an RFED as any natural person associated with an RFED as a partner, officer, or employee (or any natural person occupying a similar status or performing similar functions) in any capacity that involves: (i) the solicitation or acceptance of retail forex customers' orders; or (ii) the supervision of any person or persons so engaged.

20. Regulation 5.1(k), 17 C.F.R. § 5.1(h)(2) (2019), in relevant part, defines a "retail forex customer" as a person, other than an ECP as defined in 7 U.S.C. § 1a(18)(xi), acting on its own behalf and trading in any account, agreement, contract, or transaction described in 7 U.S.C. § 2(c)(2)(C).

21. Pursuant to Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2019), in connection with retail forex transactions, all RFEDs must be registered with the Commission. Pursuant to Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2019), in connection with retail forex transactions, all APs of an RFED must be registered with the Commission. The registration requirements of Regulation 5.3(a)(6)(i) and (ii) became effective October 18, 2010, prior to the Relevant Period identified herein.

## V. FACTS

**A. Financed Retail Forex Transactions**

22. During the Relevant Period, Defendants, through their website *www.currencyliquidators.com* (the "website"), YouTube videos, and in-person solicitations,

offered to enter into, and/or entered into, forex transactions in Vietnamese Dong, Iraqi Dinar, and other foreign currencies with retail customers who were not ECPs by offering to act as the counterparty to such transactions in Vietnamese Dong, Iraqi Dinar, and other foreign currencies.

23. As the sole managing member of Southwest Services, and the sole person responsible for its creation and operation, Sack was responsible for the content of the website both individually, and as the agent of Southwest Services.

24. During the Relevant Period, Southwest Services offered to act as the counterparty to three types of forex transactions: 1) sell customers forex in cash, on a fully-paid basis; 2) buy forex from customers for cash; and 3) sell forex via a financed retail forex transaction that Defendants described as their "Premium + Layaway Program." Only the financed retail forex transactions Defendants offered through their "Premium + Layaway Program" are the subject of the Commission's jurisdiction.

25. Under the caption "Premium + Layaway Program 'How it Works,'" Defendants, through their website, offered retail customers transactions in forex utilizing a variety of financing options, which customers could choose by selecting the "Premium + Layaway Program" thirty (30) day or forty-five (45) day financing options displayed on the website.

26. Each of the "Premium + Layaway Program" payment plans described above were financed by Southwest Services, acting as the counterparty, and none of the payment plans offered to customers resulted in actual delivery of forex within two days of the transaction(s). Instead, customers received their forex, if at all, over periods of not less than thirty (30) days, and up to forty-five (45) days, following the date of their financed retail forex transaction. Each of these financed retail forex transactions included a significant financing charge.

7

27. For example, Defendants' "Premium + Layaway Program" thirty (30) day option, as described on the website, directed actual and prospective customers to make a "good faith down payment" then "[o]nce you've made that down payment you'll be deeded the full amount of your foreign currency purchase, based on your promise to pay within the agreed 30- (sic) or 45-day term." If customers failed to pay the balance due at the end of either the thirty (30) or forty-five (45) day transaction, the customer's entire initial payment was forfeited.

28. Defendants' website offered customers a variety of options as to the amount of the transaction in forex they may choose to enter into with Southwest Services, each of which carried a significant financing charge included within the transaction. For example, if a customer chose to enter into a transaction nominally involving ten million dinars in twenty-five thousand (25,000) dinar notes, the customer would have been charged a financing charge of one hundred twenty-nine dollars ($129.00).

29. Customers typically entered into transactions in forex with Southwest Services by submitting an online account application through the website. Defendants' website advised actual and prospective customers that Southwest Services "accept[ed] a myriad of payment options such as credit cards, debit cards, eChecks, cashiers' checks, money orders, wire transfers, and cash in person."

30. The financed retail forex transactions that Defendants offered to retail customers via the "Premium+ Layaway Program" required customers to access the website and select a currency, denomination, amount for purchase, and the length of time to finance the retail forex transaction, typically either thirty (30) days or forty-five (45) days.

31. Each customer then provided his or her shipping and billing addresses and confirmed the order. The customer would immediately send a non-refundable "Premium+

8

Layaway Fee" to Southwest Services via money order or cashier's check to cover the cost of sourcing and storing the currency layaway order. The customer sent final payment within the specified time period and once the payment cleared, the currency was mailed to the customer, according to the website, during the Relevant Period.

32. During the Relevant Period, Southwest Services received at least $4,500,000 from at least 1200 customers in connection with financed retail forex and cash forex transactions.

### B. Failure to Keep and Maintain Required Books and Records

33. During the checkout process on the website, each customer opened an account with Southwest Services by providing their name, billing and shipping addresses—including city, state/province, postal code, and country—and phone number. For each of the financed retail forex transactions Southwest Services entered into during the Relevant Period, Southwest Services failed to keep and maintain records of each customer, the transaction entered into by each customer, the funds paid by each customer, and the monthly and/or quarterly account balance for each customer.

34. For each of the financed retail forex transactions Southwest Services entered into during the Relevant Period, it failed to provide each customer with a separate written disclosure statement required to be furnished to retail forex customers pursuant to Regulation 5.5(a)(1)(i), 17 C.F.R. § 5.5(a)(1)(i) (2019).

35. For each of the financed retail forex transactions Southwest Services entered into during the Relevant Period, it failed to keep and maintain books and records required to be kept and maintained by an RFED pursuant to Regulation 5.13, 17 C.F.R. § 5.13 (2019), including but not limited to: a copy of each customer's monthly statement and transaction confirmation(s).

36. Southwest Services' online account application did not seek any information about prospective customers' ability to send or receive actual delivery of forex or customers' business need for forex. During the Relevant Period, Southwest Services failed to keep or maintain any records containing any information about prospective customers' ability to send or receive actual delivery of forex or customers' business need for forex.

37. In addition, Southwest Services' online account application did not inquire as to whether a prospective customer was an ECP or about a prospective customer's savings and investments. Southwest Services failed to keep or maintain any records containing any information about a prospective customer's savings and investments or whether a prospective customer was an ECP.

38. For example, Southwest Services' online account application did not inquire if a prospective customer had assets in excess of $5 million, nor did it inquire if the prospective customer was seeking to engage in forex transactions to manage the risk of an asset or liability already owned, or about to be owned, by the prospective customer.

39. At no point in offering or entering into financed retail forex transactions during the Relevant Period did Southwest Services solicit or obtain information concerning whether prospective or actual customers were ECPs. Southwest Services failed to keep or maintain any records indicating whether its customers were ECPs.

40. Moreover, Southwest Services' retail forex transactions neither resulted in delivery within two days nor created an enforceable obligation to deliver between a seller and a buyer who had the ability to deliver and accept delivery, respectively, in connection with their lines of business. Rather, retail forex customers received their forex either 30 or 45 days following the date of their forex transactions.

41. Southwest Services' online account application did not seek any information about prospective customers' ability to send or receive actual delivery of forex or customers' business need for forex.

42. Southwest Services' financed forex transactions were the type of accounts, agreements, contracts, or transactions described in Section 2(c)(2)(C) of the CEA, 7 U.S.C. § 2(c)(2)(C) (2018).

43. None of Southwest Services' financed forex transactions was a contract of sale of a commodity for future delivery (or an option thereon) that was executed, traded on, or otherwise subject to the rules of a contract market designated pursuant to Section 5(a) of the CEA, 7 U.S.C. § 5(a) (2018).

44. Therefore, each of Southwest Services' financed forex transactions was a retail forex transaction.

### C. Sack Was the Controlling Person of Southwest Services

45. At all times during the Relevant Period, Sack was the owner and controlling person of Southwest Services. Sack was the sole managing member of Southwest Services, he owned and operated Southwest Services' website and business activities, he opened and controlled Southwest Services' bank accounts, and he was solely responsible for creating Southwest Services pursuant to the laws of the State of Wisconsin. Therefore, Sack was de facto and de jure solely in charge of the operations of Southwest Services throughout the Relevant Period.

46. At no time during the Relevant Period were Southwest Services and Sack registered as an RFED and an AP of an RFED, respectively, nor were they eligible for exemptions from the requirements to register as such with the Commission.

## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

## COUNT I

## FAILURE TO REGISTER AS A RETAIL FOREIGN EXCHANGE DEALER

**Violations of Section 2(c)(2)(C)(iii)(I)(aa) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2018), and Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2019)**

47. Paragraphs 1 through 46 of this Complaint are re-alleged and incorporated herein by reference.

48. 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) prohibits any person or entity from soliciting or accepting orders from non-ECPs for financed forex transactions if that person or entity is not registered in such capacity as the Commission shall determine, subject to certain exceptions not applicable here.

49. Regulation 5.1(m), 17 C.F.R. § 5.1(m) (2019), in relevant part, defines a retail forex transaction as any account, agreement, contract, or transaction described in 7 U.S.C. § 2(c)(2)(C).

50. Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2019), in relevant part, defines an RFED as "any person that is, or offers to be, the counterparty to a retail forex transaction," subject to certain exceptions not applicable here.

51. Pursuant to 17 C.F.R. § 5.3(a)(6)(i) (2019), an RFED, as defined in Regulation 5.1(h)(1), is required to be registered with the Commission as such.

52. During the Relevant Period, Southwest Services solicited and/or accepted orders from U.S. resident non-ECP customers in connection with retail forex transactions and was or offered to be the counterparty to those transactions. Southwest Services engaged in this conduct without being registered as an RFED.

53. By this conduct and by failing to register as an RFED during the Relevant Period, Southwest Services violated 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(i).

54. Each instance during the Relevant Period in which Southwest Services acted as an unregistered RFED, including but not limited to those specifically alleged herein, and each day such unregistered conduct took place, is alleged as a separate and distinct violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(i).

55. Sack directly or indirectly controlled Southwest Services and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Southwest Services' violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(i). Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Sack is liable as a controlling person for each of Southwest Services' violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(i).

## COUNT II

## FAILURE TO REGISTER AS AN ASSOCIATED PERSON OF A RETAIL FOREIGN EXCHANGE DEALER

**Violations of Section 2(c)(2)(C)(iii)(I)(aa) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2018), and Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2019)**

56. Paragraphs 1 through 55 of this Complaint are re-alleged and incorporated herein by reference.

57. As set forth above, during the Relevant Period, Southwest Services acted as an RFED by soliciting and accepting orders from U.S. resident non-ECPs in connection with retail forex transactions and was or offered to be the counterparty to those forex transactions.

58. Regulation 5.1(h)(2), 17 C.F.R. § 5.1(h)(2) (2019), in relevant part, defines an AP of an RFED as any natural person associated with an RFED as an officer or employee in any

capacity that involves soliciting or accepting retail forex customers' orders for retail forex transactions.

59. Regulation 5.1(k), 17 C.F.R. § 5.1(k) (2019), in relevant part, defines a "retail forex customer" as a person, other than an ECP as defined in Section §1a(18)(xi) of the CEA, 7 U.S.C. § 1a(18) (xi) (2018), acting on its own behalf and trading in any account, agreement, contract, or transaction described in 7 U.S.C. § 2(c)(2)(C).

60. Pursuant to Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii) (2019), any AP of an RFED is required to register with the Commission in that capacity.

61. During the Relevant Period, Sack acted as an officer of Southwest Services in a capacity that involved soliciting or accepting customers' orders for retail forex transactions. Sack engaged in this conduct without being registered as an AP of an RFED.

62. By this conduct and by failing to register as an AP of an RFED during the Relevant Period, Sack violated 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(ii).

63. Each instance during the Relevant Period in which Sack acted as an unregistered AP of an RFED, including but not limited to those specifically alleged herein, and each day such unregistered conduct took place, is alleged as a separate and distinct violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(ii).

64. The acts, omissions, and failures of Sack and any other employees or agents of Southwest Services as described in this Complaint occurred within the scope of their employment or agency with Southwest Services. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Southwest Services is liable as a principal for each act, omission, or failure of Sack and Southwest Services' other employees and agents constituting violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(ii).

## COUNT III

## FAILURE TO PROVIDE WRITTEN DISCLOSURE STATEMENT

**Violations of Regulation 5.5(a)(1)(i), 17 C.F.R. § 5.5(a)(1)(i) (2019)**

65. Paragraphs 1 through 65 of this Complaint are re-alleged and incorporated herein by reference.

66. 17 C.F.R. § 5.5(a)(1)(i) (2019) in relevant part, provides that no RFED may open an account that will engage in retail forex transactions for a retail forex customer unless the RFED first furnishes the retail forex customer with a separate written disclosure statement containing only the language set forth in Regulation 5.5(b), 17 C.F.R.§ 5.5(b) (2019), and the disclosure required by Regulation 5.5(e), 17 C.F.R. § 5.5(e) (2019).

67. As set forth above, during the Relevant Period, Southwest Services acted as an RFED by soliciting and accepting orders from U.S. resident non-ECPs in connection with retail forex transactions and was or offered to be the counterparty to those forex transactions.

68. At no time during the Relevant Period did Southwest Services furnish those retail forex customers with a separate written disclosure statement containing only the language set forth in 17 C.F.R. § 5.5(b) and the disclosure required by 17 C.F.R. § 5.5(e), in violation of 17 C.F.R. § 5.5(a)(1)(i) .

69. Each instance during the Relevant Period in which Southwest Services failed to furnish retail forex customers with a separate written disclosure statement containing only the language set forth in Regulation 5.5(b) and the disclosure required by 17 C.F.R. § 5.5(e), is alleged as a separate and distinct violation of violation of 17 C.F.R. § 5.5(a)(1)(i).

70. Throughout the Relevant Period Sack directly or indirectly controlled Southwest Services and did not act in good faith, or knowingly induced, directly or indirectly, the acts

constituting Southwest Services' violations of 17 C.F.R. § 5.5(a)(1)(i). Therefore, pursuant to 7 U.S.C. § 13c(b), Sack is liable as a controlling person for each of Southwest Services' violations of Regulation 17 C.F.R. § 5.5(a)(1)(i).

## COUNT IV

## FAILURE TO KEEP REQUIRED BOOKS AND RECORDS

### Violations of Regulation 5.13(d), 17 C.F.R. § 5.13(d) (2019)

71. Paragraphs 1 through 70 of this Complaint are re-alleged and incorporated herein by reference.

72. 17 C.F.R. § 5.13(d), in relevant part, provides that each RFED shall maintain, in accordance with Regulation 1.31, 17 C.F.R. § 1.31 (2019), a copy of each monthly statement and confirmation required by Regulation 5.13(a) and (b), 17 C.F.R. § 5.13(a), (b) (2019).

73. As set forth above, during the Relevant Period, Southwest Services acted as an RFED by soliciting and accepting orders from U.S. resident non-ECPs in connection with retail forex transactions and was or offered to be the counterparty to those forex transactions.

74. At no time during the Relevant Period did Southwest Services maintain, in accordance with Regulation 1.31, 17 C.F.R. § 1.31 (2019), a copy of each monthly statement and confirmation required by 17 C.F.R. § 5.13(a) and (b), in violation of 17 C.F.R. § 5.13(d).

75. Each instance during the Relevant Period in which Southwest Services failed to maintain, in accordance with 17 C.F.R. § 1.31, a copy of each monthly statement and confirmation required by 17 C.F.R. § 5.13(a) and (b), is alleged as a separate and distinct violation of violation of 17 C.F.R. § 5.13(d).

76. Throughout the Relevant Period Sack directly or indirectly controlled Southwest Services and did not act in good faith, or knowingly induced, directly or indirectly, the acts

constituting Southwest Services' violations of 17 C.F.R. § 5.13(d). Therefore, pursuant to 7 U.S.C. § 13c(b), Sack is liable as a controlling person for each of Southwest Services' violations of 17 C.F.R. § 5.13(d).

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers, enters:

A. An order finding that Defendants violated Section 2(c)(2)(C)(iii)(I)(aa) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2018), and Regulations 5.3(a)(6)(i), 5.3(a)(6)(ii), 5.5(a)(1)(i), and 5.13(d), 17 C.F.R. §§ 5.3(a)(6)(i), 5.3(a)(6)(ii), 5.5(a)(1)(i), and 5.13(d) (2019);

B. An order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct in violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. §§ 5.3(a)(6)(i), 5.3(a)(6)(ii), 5.5(a)(1)(i), and 5.13(d);

C. An order directing Defendants, as well as any successors, to disgorge pursuant to such procedure as the Court may order, all benefits received from the acts or practices described herein that constitute violations of the Act and Regulations, pre-judgment interest from the date of such violations, and post-judgment interest;

D. An order directing Defendants, as well as any successors, to make full restitution, pursuant to such procedure as the Court may order, to every customer whose funds Defendants received or caused another person or entity to receive as a result of the acts and practices described herein that constitute violations of the Act and Regulations, pre-judgment interest from the date of such violations, and post-judgment interest;

E. An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from directly or indirectly:

(1) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

(2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for their own personal account or for any account in which they have a direct or indirect interest;

(3) Having any commodity interests traded on their behalf;

(4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(6) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019);

(7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9); and

(8) Engaging in any business activity related to commodity interests;

F.  An Order directing Defendants, as well as any successors, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between them and any customer whose funds were received by Defendants as a result of the acts and practices described herein that constitute violations of the Act and Regulations, as described herein;

G.  An order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the CEA and Regulations, as described herein;

H.  An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412 (2018); and

I.  An order directing such further relief as the Court deems proper.

Dated: September 14, 2020

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By: s/Kassra Goudarzi
Timothy J. Mulreany (MD Bar No. 8812160123)
Kassra Goudarzi (DC Bar No. 490709)
CFTC, Division of Enforcement
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5000
Fax:  (202) 418-5937
tmulreany@cftc.gov
kgoudarzi@cftc.gov

**ATTORNEYS FOR PLAINTIFF**